IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| Brian Musgrave,<br><br>Plaintiff,<br><br>v.<br><br>Herring Networks, Inc.; Dan Ball; Louder with Crowder, LLC; Steven Crowder; Gerald Morgan, Jr.,<br><br>Defendants. | Case No. 0:25-cv-13373-JDA<br><br>**OPINION AND ORDER** |

This matter is before the Court on motions by Defendant Herring Networks, Inc. ("Herring") to dismiss for lack of personal jurisdiction [Doc. 32] and to dismiss for failure to state a claim [Doc. 33]; by Defendants Louder with Crowder, LLC ("LWC"); Steven Crowder; and Gerald Morgan, Jr. (collectively, the "LWC Defendants") to dismiss for failure to state a claim [Doc. 34] and for summary judgment [Doc. 43]; and by Plaintiff to amend the First Amended Complaint (the "FAC") [Doc. 45]. For the reasons to be discussed, the Court grants Herring's motion to dismiss for lack of personal jurisdiction, grants the LWC Defendants' summary judgment motion, finds as moot Herring's and the LWC Defendants' motions to dismiss for failure to state a claim, and grants in part and denies in part Plaintiff's motion to amend the FAC.

## BACKGROUND

The FAC asserts the following relevant facts. On February 10, 2025, South Carolina Congresswoman Nancy Mace spoke on the floor of the House of Representatives, discussing her personal story of sexual abuse by her ex-fiancé Patrick Bryant. [Doc. 29 at 1.] According to Plaintiff, this speech was part of a campaign of

"blackmail and extor[t]ion" against Bryant by Mace, which began in November 2023, when Mace accessed Bryant's phone and discovered many videos and images of women in compromising positions. [*Id.* at 1 & ¶¶ 34–36, 40–47.] Plaintiff contends that his only connection to Mace is his long-time friendship with Bryant and co-ownership with him of a South Carolina condominium (the "Condominium") and home. [*Id.* at 2 & ¶¶ 11, 13, 15–20.] In the Condominium, a Google camera positioned on the refrigerator captured images of the living room. [*Id.* ¶¶ 21, 22, 27.]

Herring is a media company based in California "that produces news and entertainment programming through the One American News Network" ("OAN"). [*Id.* ¶ 2.] The FAC's substantive allegations against Herring and its political talk show host Defendant Dan Ball ("Ball") are as follows:

> 68. On April 11, 2025, Ms. Mace appeared on Defendant OAN and was interviewed by Dan Ball about the arrest of one of the [men] Mace accused.[1]
>
> 69. During the interview, Defendant Ball took the following defamatory shot at [Plaintiff]:
>
> > "**One of the perverts** that you went after when you called **them** out and doxed them on the house floor finally got arrested. You're getting some satisfaction here, Nancy." **Emphasis Added.**
>
> 70. During the April 11, 2025, interview, Defendants OAN and Ball defamed [Plaintiff] by referring to him as a pervert.
>
> 71. During the April 11, 2025, interview, Defendants OAN and Ball defamed [Plaintiff] implicitly by adopting the point of view that he is a rapist, a sex trafficker and/or a predator as alleged in Ms. Mace's speech.

---

[1] The FAC mistakenly refers to "Defendant OAN," but OAN is not a named defendant in this lawsuit.

> 72. During the April 11, 2025, interview, Defendants OAN and Ball defamed [Plaintiff] by communicating that he should be arrested for his crimes."

[*Id.* ¶¶ 68–72.]

The FAC also alleges that on May 22, 2025, Mace appeared on the "Louder with Crowder" podcast (the "Podcast"), "during which she engaged in a long discourse about her speech [on the House floor] and about the men she had accused of committing sexual crimes, including [Plaintiff]" (the "LWC Interview"). [*Id.* ¶ 79.] The FAC alleges that Podcast hosts Crowder and Morgan "grouped [Plaintiff] along with the other men that [Mace] identified in her speech in making . . . defamatory statements about all of them." [*Id.* ¶ 80.]

Based on the above facts, the FAC alleges claims against "Defendant OAN" and the LWC Defendants for defamation per se.[2] [*Id.* ¶¶ 90–110.] The FAC requests actual and punitive damages, injunctive relief, and attorneys' fees and costs. [*Id.* at 17.]

On January 28, 2026, Herring filed motions to dismiss for lack of personal jurisdiction and for failure to state a claim, and the LWC Defendants filed a motion to dismiss for failure to state a claim. [Docs. 32; 33; 34; *see* Docs. 36; 39; 42.] On February 25, 2026, the LWC Defendants also filed a motion for summary judgment. [Doc. 43; *see* Doc. 44.] Finally, on March 11, 2026, Plaintiff filed a motion to amend the FAC. [Doc. 45; *see* Doc. 46.] These motions are all ripe for review.

---

[2] As noted, OAN is not named as a Defendant in the FAC. The Court assumes, as Herring does [Doc. 32-1 at 5 n.4], that Plaintiff intended "OAN" to refer to Herring.

## DISCUSSION

**Herring's Rule 12(b)(2) Motion**

Herring argues it is entitled to dismissal of the FAC for lack of personal jurisdiction. [Doc. 32-1.] The Court agrees.

***Applicable Law***

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a party may move to dismiss an action based on a lack of personal jurisdiction. "[W]hen . . . [a] court decides a pretrial personal jurisdiction dismissal motion without an evidentiary hearing, the plaintiff need prove only a prima facie case of personal jurisdiction." *Mylan Lab'ys, Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993). To satisfy this burden, the plaintiff must base its claim for personal jurisdiction "on specific facts set forth in the record." *Magic Toyota, Inc. v. Se. Toyota Distribs.*, 784 F. Supp. 306, 310 (D.S.C. 1992). Accordingly, "[t]he pleadings, affidavits, and other supporting documents presented to the court are construed in the light most favorable to [the] plaintiff, drawing all inferences and resolving all factual disputes in its favor." *Masselli & Lane, PC v. Miller & Schuh, PA*, No. 99-2440, 2000 WL 691100, at *1 (4th Cir. May 30, 2000); *see also Mylan Lab'ys*, 2 F.3d at 62 ("In deciding whether the plaintiff has proved a prima facie case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor."). The court, however, "need not credit conclusory allegations or draw farfetched inferences." *Massellli,* 2000 WL 691100, at *1 (internal quotation marks omitted).

Personal jurisdiction in federal courts is determined by whether the defendant would be "subject to the jurisdiction of a court of general jurisdiction in the state where the

district court is located." Fed. R. Civ. P. 4(k)(1)(A). In determining whether South Carolina state law would authorize personal jurisdiction over the defendant, the Court properly examines both the state long arm statute and the due process requirements of the Fourteenth Amendment. *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997).

South Carolina's long arm statute provides:

> (A) A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's:
>
> (1) transacting any business in this State;
>
> (2) contracting to supply services or things in the State;
>
> (3) commission of a tortious act in whole or in part in this State;
>
> (4) causing tortious injury or death in this State by an act or omission outside this State if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State;
>
> (5) having an interest in, using, or possessing real property in this State;
>
> (6) contracting to insure any person, property, or risk located within this State at the time of contracting;
>
> (7) entry into a contract to be performed in whole or in part by either party in this State; or
>
> (8) production, manufacture, or distribution of goods with the reasonable expectation that those goods are to be used or consumed in this State and are so used or consumed.

S.C. Code Ann. § 36-2-803(A). "South Carolina's long-arm statute has been interpreted to reach the outer bounds permitted by the Due Process Clause." *ESAB Grp.,* 126 F.3d at 623. Therefore, the appropriate question for the Court in considering a personal jurisdiction defense raised by an out-of-state defendant is whether that defendant has "established 'minimum contacts with [South Carolina] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" *Id.* (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Personal jurisdiction may arise through specific jurisdiction, based on conduct alleged in the suit, or through general jurisdiction. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 711 (4th Cir. 2002). To determine whether specific personal jurisdiction exists, courts should examine "(1) the extent to which the defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Id.* at 712 (alteration in original). If the defendant's contacts with the state are not the basis of the suit, then jurisdiction must come from more persistent, unrelated contacts with the state; "the defendant's activities in the [s]tate must have been continuous and systematic." *Id*. (internal quotation marks omitted).

The Fourth Circuit recently discussed the principles applicable to purposeful availment in *Khashoggi v. NSO Group Technologies, Ltd.*, 138 F.4th 152 (4th Cir. 2025):

> Specific personal jurisdiction can be exercised over a foreign defendant who commits acts outside the forum if the conduct was "expressly aimed" at the forum. *Calder v. Jones*, 465 U.S. 783, 789 (1984); *see also Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 230 (4th Cir. 2019).

> In *Calder*, a libel suit, the Supreme Court held that a California court possessed personal jurisdiction over Florida-based reporters for an allegedly libelous article they had written about a California actress. 465 U.S. at 788–89. The Court reasoned that "California [was] the focal point both of the story and of the harm suffered." *Id.* at 789. That was because the authors' "actions were expressly aimed at California" and they were aware that harm from the defamatory article would be felt in California due to the actress's work there and the fact the publication had extensive circulation in California. *Id.* at 789–90. The Court concluded that personal jurisdiction may lie because the reporters, due to their actions, could "reasonably anticipate being haled" into a California court. *Id.* at 790 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).
>
> We have acknowledged the continuing validity of the *Calder* "effects" test, as well as its limitations. *See Hawkins*, 935 F.3d at 230 ("It is true that the in-forum effects of out-of-forum conduct can constitute minimum contacts with the forum sufficient to support personal jurisdiction."). The effects of the act for which a plaintiff seeks relief must create a connection to the forum itself, "not just to parties who happen to live there." *Id.* The connection must be "substantial," so that "a person cannot be haled into the forum simply because he knew that his conduct would have incidental effects there." *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)). Finally, the charged conduct must be "expressly aimed" at the forum, or, in other words, the forum must be the "focal point" of the conduct. *Id.* (first quoting *Walden*, 571 U.S. at 288 n.7; and then quoting *Consulting Eng'rs* [*Corp. v. Geometric Ltd.*], 561 F.3d [273, 280 (4th Cir. 2009)]).

*Id.* at 160 (first alteration in original) (parallel citations omitted).

When a plaintiff attempts to establish special jurisdiction based on a defendant's allowing third parties to access information electronically, the Fourth Circuit has determined that

> a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions

> within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.

*ALS Scan*, 293 F.3d at 714; *see Young v. New Haven Advoc.*, 315 F.3d 256, 263 (4th Cir. 2002).

Importantly, the Fourth Circuit has consistently held that merely allowing a state's residents access to electronic information is not directing electronic activity into the state. *See, e.g., Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 143 (4th Cir. 2020) (holding that the defendant was not subject to personal jurisdiction in South Carolina based on its website when its website "was accessible to all but targeted at no one in particular"); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 401 (4th Cir. 2003) ("[W]hen [the defendant] set up its generally accessible, semi-interactive Internet website, it did not thereby direct electronic activity into Maryland with the manifest intent of engaging in business or other interactions within that state in particular.").

***The Parties' Positions***

Relying on these principles, Herring moves to dismiss the FAC based on lack of personal jurisdiction and has submitted a declaration from its president averring the following facts:

- Herring is incorporated under the laws of the State of California. [Doc. 12-2 ¶ 2.]
- Herring's principal place of business is in San Diego, California where its corporate headquarters are located and where its executive management and substantially all of its employees (approximately 91%) work. [*Id.*]
- Herring does not have or maintain any offices, employees, mailing addresses, telephone listings, or bank accounts (or anything else for that matter) in South Carolina. [*Id.*]

- Herring does not own any real property, personal property, or other assets located in South Carolina, or lease, rent, or operate any facilities in South Carolina. [*Id.* ¶ 8.]

- OAN has never had a reporter or office in South Carolina. [*Id.*]

- Herring is not registered to do business in South Carolina nor has it paid taxes to any South Carolina taxing authority. [*Id.* ¶ 9.]

- Ball interviewed Mace from Herring's San Diego, California, studios, and Mace was located in Washington, D.C. during the interview. [*Id.* ¶ 6.]

- Herring does not target and focus any of its advertising specifically to South Carolina. [*Id.* ¶ 10.]

- OAN is distributed via the internet-based website "OAN Live," which allows viewers to access programing via computer devices (i.e. computer, smart phone, tablet, etc.). [*Id.* ¶ 4.]

- OAN is also distributed via cable and video providers GCI Communications, Buckeye Communications, Dish Network, and others. All of OAN's distribution agreements were negotiated outside of South Carolina. [*Id.* ¶ 5.]

- Other than the fact that national distribution necessarily allows for broadcast in South Carolina, Herring has not entered into any contracts for OAN or anyone else that could be or are to be performed in whole or in part in South Carolina, nor has it contracted with or appointed any distributors, franchisees, or representatives to operate in South Carolina. [*Id.*]

Plaintiff argues in response that "OAN produces television shows, including "Real America with Dan Ball" and "invites viewers /visitors to subscribe to OAN produced news alerts." [Doc. 36 at 6.] Plaintiff contends that "[i]t is reasonable to surmise that OAN enjoys a large consumer base in South Carolina given the fact that South Carolina voted 58.23% for Donald Trump in the 2024 election" and that "Nancy Mace would have particular appeal in South Carolina to South Carolinians." [*Id.* at 7.] Plaintiff also argues that it has the right to engage in jurisdictional discovery. [*Id.* at 7–9.]

***Analysis***

The Court concludes that Plaintiff has not offered any evidence or even alleged any facts that would indicate that Herring directed electronic activity into South Carolina with the intent of engaging in business or other interactions within South Carolina.[3] As for Plaintiff's request for jurisdictional discovery, "[w]hen a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery." *Carefirst*, 334 F.3d at 402. On the other hand, "[j]urisdictional discovery is proper when the plaintiff has alleged sufficient facts to suggest the possible existence of personal jurisdiction." *Pandit v. Pandit*, 808 F. App'x 179, 183 (4th Cir. 2020). Here, Plaintiff's allegations that Donald Trump received 58.23% of the presidential votes in the state and that Nancy Mace represents a South Carolina district do not show any targeting of South Carolina by Herring. Accordingly, Plaintiff's request for jurisdictional discovery is denied, Herring's motion to dismiss for lack of personal jurisdiction is granted.[4]

[3] That OAN is nationally distributed via cable and video providers in addition to being accessible via an internet-based website does not change this result. *See Branca v. Bai Brands, LLC*, No. 3:18-cv-00757-BEN-KSC, 2019 WL 1082562, at *18 n.17 (S.D. Cal. Mar. 7, 2019) ("Absent a showing that [the defendant] directed the Super Bowl advertisement or any of its marketing to California specifically (as opposed to the nation as a whole) . . . the marketing campaign cannot give rise to personal jurisdiction." (internal quotation marks omitted)); *Akbar v. Bangash*, No. 15-cv-12688, 2017 WL 4334912, at *8 (E.D. Mich. July 11, 2017) ("Without anything to suggest that it was directed to residents in Michigan, a nationally broadcast television commercial is nothing more than the sort [of] passive availment of Michigan's opportunities that is insufficient to exercise personal jurisdiction." (internal quotation marks omitted)).

[4] Petitioner argues that *Batts v. Snap, Inc.*, No. 2:23-cv-03565-DCN, 2024 WL 3677802 (D.S.C. Aug. 6, 2024), supports its position that Herring's motion to dismiss should be denied and jurisdictional discovery granted. [Doc. 36 at 7–8.] In *Batts*, the court concluded that the plaintiffs alleged sufficient facts to warrant jurisdictional discovery

**The LWC Defendants' Rule 56 Motion**

The LWC Defendants argue they are entitled to summary judgment. [Doc. 45.] The Court agrees.

***Applicable Law***

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all

---

when they alleged that the defendant, the developer of a mobile application for the social media platform Snapchat,

> collected location data and other user data from Snapchat users in South Carolina using the Speed Filter . . . ; sold advertisements targeted to Snapchat users in South Carolina . . . based on the data [the defendant] collected from South Carolina users; and directed advertisements targeted to Snapchat users in South Carolina by way of the Snapchat platform.

*Id.* at *8 (alterations in original) (internal quotation marks omitted). They also alleged "that Snapchat users entered into agreements with Snapchat regarding the use of their location data for commercial purposes," that "Snapchat collects revenue from its advertising targeted at South Carolina users," and that "their claims arose from use of . . . Snapchat's efforts to target South Carolina users." *Id.* There are no comparable allegations in the FAC.

inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

***Analysis***

To prove a claim for defamation in South Carolina,[5] "a plaintiff must show (1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Erickson v. Jones St. Publishers, LLC*, 629 S.E.2d 653, 664 (S.C. 2006). "[A] statement is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Fleming v. Rose*, 567 S.E.2d 857, 860 (S.C. 2002).

"It is the trial court's function to determine initially whether a statement is susceptible of having a defamatory meaning." *White v. Wilkerson*, 493 S.E.2d 345, 347 (S.C. 1997). "A motion for summary judgment should be granted only if the court determines the publication is incapable of any reasonable construction which will render the words defamatory." *Id.* "[A]ll of the parts of the publication must be considered in order to ascertain the true meaning, and words are not to be given a meaning other than that which the context would show them to have." *Jones v. Garner*, 158 S.E.2d 909, 912

---

[5] This Court possesses diversity jurisdiction over this case, and thus South Carolina law governs the defamation claim. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938).

(S.C. 1968) (internal quotation marks omitted); *see Boone v. Sunbelt Newspapers, Inc.*, 556 S.E.2d 732, 738 (S.C. Ct. App. 2001).

The FAC identifies two allegedly defamatory statements made by Morgan and Crowder during the LWC Interview [Doc. 29 ¶ 80]: a statement by Morgan that "[t]hese guys . . . [d]eserve every single ounce of punishment that we can get" [Doc. 43-2 at 42 (37:19–23)] ("Morgan's Statement"); and a statement by Crowder that "with that amount of evidence, it would seem like there will be some people . . . put in prison for life" [*id.* at 44 (39:1–5)] ("Crowder's Statement").[6] The LWC Defendants argue that Plaintiff has not forecasted sufficient evidence that Defendants made any statements that are false and defamatory as to Plaintiff. [Doc. 43-1.] The Court agrees with the LWC Defendants that neither of the identified statements, when viewed in context, are susceptible to a defamatory meaning as to Plaintiff.[7]

<u>Morgan's Statement</u>

First, the Transcript demonstrates that Morgan's Statement could not reasonably be understood to be asserting that Mace's allegations against Plaintiff were true or even that there existed substantial evidence of his guilt. During the LWC Interview, Mace referred to the allegations she had made on the House floor and repeated several of those allegations. [*E.g.*, Doc. 43-2 at 11 (6:11–24), 14–15 (9:16–10:5), 16–17 (11:5–12:13).]

[6] The LWC Defendants attached a transcript of the LWC Interview (the "Transcript") to their summary judgment motion. [Doc. 43-2.]

[7] The Court notes that summary judgment is usually inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. de Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 448–49 (4th Cir. 2011). However, given that Plaintiff has not argued that the summary judgment motion is premature and does not challenge the authenticity of the Transcript, the Court finds it appropriate to rule on the motion.

Morgan commented on several subjects related to the accusations, including stating that he favored harsh punishments for men who were guilty of the sort of crimes Mace alleges.[8] [*Id.* at 39 (34:9–13).] As to that point, Morgan stated, "I'm a 100 percent like, bury these guys under the jails," at which point, Crowder interjected, "Well, the guys who actually commit rape." [*Id.*] Morgan then continued, "Yes, the guy who's committing rape and disseminating these pictures are the worst of the worst. We would kick their ass if they were in front of us. All of us agree on that . . . ." [*Id.* at 39 (34:14–17).]

Morgan, Crowder, and Mace then proceeded to discuss whether specific allegations like Mace's should be made publicly against identified people, given the potential for significant reputational harm if the allegations turned out to be false. [*Id.* at 39–42 (34:17–37:17).] Morgan then repeated his earlier point, stating, "*[A]gain*, these guys . . . [d]eserve every single ounce of punishment that we can get. But that moment was in 2023 when you found that information, right." [Doc. 43-2 at 42 (37:18–24) (emphasis added).] Given the time that had elapsed since the alleged criminal conduct, Morgan questioned whether any legitimate public safety interest justified making public allegations against specific people. [*Id.* at 42–43 (37:23–38:22).] After Mace left the discussion, Morgan closed by again emphasizing that he had tried to bring the conversation to the question of whether it was appropriate for Mace to publicly name the men who she was making her allegations against. [*Id.* at 44–45 (39:21–40:8).] And then

[8] Nothing Morgan said during the LCW Interview indicated that he claimed to possess information supporting the truth of Mace's allegations. In fact, several of his comments indicated that he did *not* know whether the allegations were true. [*E.g.*, Doc. 43-2 at 33 (28:6–8) ("[T]hese guys should be getting long prison sentences *if what we're claiming is true*." (emphasis added)), 47 (42:4–5) ("I'm not defending in any way the actions *if they turn out to be 100 percent what [Mace] said*." (emphasis added)).]

he expressed dismay that Mace's allegations had not been investigated. [*See id.* at 48 (43:10–14) ("And what the hell is going on in South Carolina that they're not getting to the bottom of this stuff that [Mace is] talking about? Get it done. Get it done. Find out what the facts are and either dismiss it or go.").]

Considering this context, it is apparent that the actual truth of Mace's allegations was not central to the issues Morgan was attempting to discuss and that Morgan's Statement that "again, these guys . . . [d]eserve every single ounce of punishment that we can get" did not concern Morgan's personal belief about the guilt or innocence of the men Mace had accused. Rather, it could be reasonably understood only as an assertion that the accused men deserved harsh punishment *if they were actually guilty*. The Court therefore concludes that Morgan's Statement is not reasonably susceptible to a defamatory meaning as to Plaintiff, and the Court grants summary judgment to Morgan. *See* Restatement (Second) of Torts § 566 (1977) ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.").

<u>Crowder's Statement</u>

The LWC Defendants also argue that Crowder's Statement was not susceptible to a defamatory meaning about Plaintiff. [Doc. 43-1 at 7–8.] Again, the Court agrees.

From a reading of the Transcript, it appears that Crowder's only information about the facts underlying Mace's allegations was what Mace reported. [*See, e.g.*, Doc. 42-3 at 23 (18:8–9) (asking Mace if the men being accused could sue if the allegations are false), 24–25 (19:23–20:4) (stating that it is understandable how people might be

skeptical regarding whether Mace's allegations are true), 40 (35:19–21) ("I didn't know about this until you began speaking about it. *So if they did that*, that's horrible, and that would be the answer.") (emphasis added), 46 (41:3) (in response to Morgan's comment that harsh punishments for sexual crimes are appropriate, Crowder interjecting, "If they did it.").

Crowder's comment, toward the end of the LWC Interview, that, "[W]ith *that amount of evidence*, it would seem like there will be some people . . . put in prison for life" [*id.* at 44 (39:1–5)], is susceptible only to the meaning that "that amount of evidence" referred to the amount of evidence that Mace *claimed* she had, not the amount that actually existed. Crowder's opinion about what legal consequences would result *if Mace were correct about the evidence that* existed was simply a matter of opinion and was not defamatory as to Plaintiff. *See* Restatement (Second) of Torts § 566. The Court therefore grants summary judgment to Crowder.

LWC

Finally, because neither Morgan's Statement nor Crowder's Statement are susceptible to a defamatory meaning as to Plaintiff, Plaintiff's defamation claim against LWC also fails. The Court thus grants summary judgment to LWC.[9]

**Plaintiff's Motion to Amend the First Amended Complaint and Service on Ball**

A party may amend his pleading once before trial as a matter of course under circumstances not applicable here, Fed. R. Civ. P. 15(a)(1), and "[i]n all other cases, a

[9] Given the Court's conclusion that the LWC Defendants are entitled to summary judgment for the reasons discussed, the Court declines to address their alternative arguments. Additionally, because the Court grants the LWC Defendants' summary judgment motion and Herring's motion to dismiss for lack of personal jurisdiction, the

party may amend its pleading only with the opposing party's written consent or the court's leave," Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* "A district court may deny a motion to amend when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile." *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010); *see Foman v. Davis*, 371 U.S. 178, 182 (1962) (noting that leave to amend may be denied for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.").

Initially, the Court concludes that Plaintiff's motion to amend is futile as to Herring and the LWC Defendants. *See Johnson v. District of Columbia*, 244 F.R.D. 1, 6–7 (D.D.C. 2007) (granting in part a motion to amend a complaint but denying the motion on the basis of futility as to one defendant), *aff'd*, 552 F.3d 806 (D.C. Cir. 2008); *see also Vorak v. Servatius*, No. 13-CV-0335-SMJ, 2014 WL 6879067, at *7–9 (E.D. Wash. Dec. 4, 2014) (analyzing the futility of a motion to amend the complaint separately as to each defendant and denying as futile motion to amend as to defendants who were entitled to summary judgment on the original complaint when the proposed amended complaint would not affect that result), *aff'd*, 648 F. App'x 740 (9th Cir. 2016). Nothing in Plaintiff's proposed Second Amended Complaint [Doc. 45-1] would change the Court's analysis regarding Herring's entitlement to dismissal for lack of personal jurisdiction or the LWC Defendants'

Court finds as moot these Defendants' motions to dismiss for failure to state a claim. [Docs. 33; 34.]

entitlement to summary judgment, and Plaintiff does not argue otherwise. Plaintiff's motion to amend is therefore denied as futile as to Herring and the LWC Defendants, and those Defendants are dismissed from the action.

As for Ball, it appears from the docket that he has not been served. When the case was removed to this Court, Ball had not been served with the Summons and Complaint [Doc. 1 ¶ 3], and a review of the docket discloses no proof of service as to Ball since the case was removed. The Court therefore orders Plaintiff to show cause why Ball should not be dismissed without prejudice under Rule 4(m) of the Federal Rules of Civil Procedure for lack of timely service. Additionally, the Court denies Plaintiff's motion to amend as to Ball based on the apparent lack of service.

## CONCLUSION

For the foregoing reasons, Herring's motion to dismiss for lack of personal jurisdiction [Doc. 32] is GRANTED, and Herring is dismissed without prejudice; the LWC Defendants' motion for summary judgment [Doc. 43] is GRANTED; Herring's and the LWC Defendants' motions to dismiss for failure to state a claim [Docs. 33; 34] are FOUND AS MOOT; and Plaintiff's motion to amend the First Amended Complaint [Doc. 45] is DENIED. Finally, Plaintiff is ordered to show cause, by October 9, 2026, why Ball should not be dismissed under Rule 4(m) of the Federal Rules of Civil Procedure for lack of timely service.

IT IS SO ORDERED.

s/ Jacquelyn D. Austin
United States District Judge

September 30, 2026
Columbia, South Carolina